Letter No. 182086 N. Re. Lantus Direct Purchaser Antitrust Litigation. Mr. Weisler, good morning. Good morning, Your Honor. Thank you. May it please the Court, Matthew Weisler on behalf of the appellants. With the Court's permission, I'd like to reserve four minutes for rebuttal. Four minutes, you have. Thank you. When Congress made the decision to restrict the types of patents that may be listed in the Orange Book, it struck an important balance. Because listing a patent in the Orange Book blocks affordable drug alternatives from the market for up to three additional years, granting a brand-new manufacturer a near-automatic and extended period of lucrative exclusivity meant that Congress sought to carefully cabin the availability of that lucrative exclusivity to only a specific and narrow subset of drug-related patents. Under the governing statute, Section 355b.1, and its implementing regulations, only those patents that, quote, claim the drug or claim a method of using the drug may be listed. As a result, it is only these types of patents that may properly confer additional market exclusivity to a brand-name drug company. This case involves the first of these two requirements. In 2003, the FDA provided a straightforward definition for what it means for a patent to claim the drug. The patent must claim either the drug's active ingredient or a finished dosage form that contains the drug's active ingredient. As the FDA has explained, restricting Orange Book listing to only these types of patents serves the core goals of Hatch-Waxman by ensuring that the lucrative market exclusivities afforded by the Orange Book are available only for the patented aspects of a drug that other companies must use. Excuse me, I have a few questions to clarify this that would help. Does this, as a practical matter, rise or fall on our analysis of the 864 patent? Because the briefs, 99 percent discuss the 864. Yes, that's correct. And then, does the FDA have any procedure for challenging, in other words, could a party go to the FDA and say they filed something that got in the Orange Book? It shouldn't have been. No, Your Honor. There is no process for the FDA to reject patents that are listed in the Orange Book. It's purely ministerial. And then, the regulations say you shall file such and such. Is there any penalty, other than a loss of rights that may have been acquired, is there any penalty on a drug manufacturer for deciding wrongly that, well, this isn't one that qualifies, so I'm not going to file it? Not that I'm aware of, Your Honor. In the FDA, this is a carefully calibrated framework for which patents entitled brand-name drug manufacturers to obtain this market exclusivity. And Congress, when it wrote this statute, was careful to make sure that there was only a narrow set of patents that could confer what is a very lucrative period of exclusivity, and it's only those patents that claim the drug. And, you know, you can ask my friend on the other side, you will not hear them say that the 864 patent, or any of the Penn patents, actually claims the drug, insulin, Glardine, or Lantus, and that's because it does not. Where the district court went wrong in this case was it read the statute, patents need to claim the drug, and the implementing regulations, which specifically define the drug to exclude the type of patents that were listed here, to hold some ambiguity. But the text of the statute and the implementing regulations are very clear. They, in fact, probably couldn't be clearer. They provide an absolute definition for what it means for a patent to claim the drug, and the 864 patent, because it has nothing to do with the drug, it's entirely about a component, doesn't actually satisfy that definition. As I recall, under the 864 patent, there are ten claims. Yes. To the uninitiated, they all seem to be claiming some drive mechanism within the pen. More or less, that's correct. Do you read any of those ten claims as claiming the pen itself? No. None of them claim the pen itself, and even if they were to claim the pen, that would not do it. What's necessary is something else, the pen plus the actual drug. And we've cited examples in our brief where companies, in fact, have satisfied this definition. The Narcan patent, for instance. If you go and you look at that patent, the language in the claim section says, quote, a pre-primed device adapted for nasal delivery of a pharmaceutical composition containing about four milligrams of naloxone hydrochloride. That satisfies the requirement that Congress and the FDA have imposed for when a patent can be listed in the Orange Book, and as a matter of law, confer this exclusive and lucrative market period where no other competitors can enter into this space. And I think for Sanofi here to be able to successfully defend the way the district court understood this framework, and you see this throughout their entire brief, instead of saying our patent meets this test, what they say is, well, our patent is a patent that is integral to a drug. Well, that test, whether it's integral to or relates to, which is the way the district court saw it below, unavoidably requires adding words to the statutory definition and the implementing regulations that are not there. There is nowhere that you can find in those definitions where integral to counts as a basis for including a patent in the Orange Book. And I think it's important to step back and understand why. Congress did not want to open up this exclusivity period for all of the types of patents that may be in some way related to a drug product. Instead, they specifically cabined those patents that can trigger this automatic exclusivity and bar the FDA from approving drugs, competitor drugs, into this space for up to 30 months, only if those patents actually claim the drug. And I think if this court were to adopt the view espoused by Sanofi here or the way that the district court understood those issues, it would open up a free-for-all in the way that companies put patents into the Orange Book, precisely because, as you acknowledge or observe, the FDA does not play an oversight role in this process. They have left it to the courts to police the use and existence of patents in the Orange Book, and they do not exercise any ability to police or reject patents that don't satisfy that definition. And I don't think the district court quite understood that. There is no ambiguity in this statute, and the only way that Sanofi can mount an effort to actually convince the court that it listed this properly was to argue for a definition that isn't contained in either the statute or the regulations. I assume you're going to turn to the antitrust issue. I am, Your Honor. I'll do that. Unless you have a question, I'm happy to pose that now. Well, you say what you want about it, and my colleagues may have different views, but a lot of that seems to pivot. Normally in antitrust law, if you acquire a monopoly and you do so by improper means, your state of mind is really not relevant. But there is some case law out there that a reader discusses in his treatise where if it's a highly regulated area, then there may be some requirement. I think MCI versus AT&T on the Second Circuit. Yes. This takes me back to a couple of the original questions I asked you. Would you regard this as an area in which a manufacturer, a business, faces a choice? They need to do something, and so therefore we don't want to penalize them if they were at least reasonable. Or is this an area where they didn't need to do anything? Sure. I think it's the latter, Your Honor. And I would say no one here disputes, not even Sanofi nor the district court, disputed that an improper orange book listing can give rise to antitrust liability. And so I think that threshold question Your Honor just asked is off the table because it isn't a so highly regulated space that the company is put on the horns of doing something that would trigger liability one way or the other. You're right. They don't seem to make that argument, and I don't think they even cite MCI, if I remember correctly, for that point. But they do seem to argue that just freestanding under antitrust law, the improper thing has to be objectively unreasonable or something like that. Yes, Your Honor. I think that there is this kind of question about where to draw the line on objectively reasonable. I mean, just to start where you began, there is no, you know, motive is irrelevant here. So we do not ask whether the defendant, you know, took some action in good faith. What we are focused on, I think, is this question of, well, is there some objective reasonableness to their conduct. Here, listing a patent in direct violation of a statute in the implementing regulations is itself objectively unreasonable, and I don't see how you get past that first step. But even so, if you look at this statute, the first requirement, that the patent claim the drug, is binary. It must satisfy that definition to list it as a patent, unlike the second requirement of Section 355B1, which asks, which is still a requirement, so it needs to satisfy both of these requirements. But the second requirement requires the manufacturer to list only those patents where a claim of patent infringement could reasonably be asserted. So I think if you're looking for where this question of reasonableness comes into this, it's in a claim that the manufacturer violated the second requirement of 355B1, but the first requirement, and the one that this case turns on, Commerce chose not to include that same question of reasonableness. So I think either because the statute is unambiguous and clear, and Sanofi acted in violation of that statute, or because there is no reasonableness component built into the statute on this theory, either way, you're in a world where there is no objectively reasonable justification for Sanofi having taken this conduct and listed the patent in the orange book. And once you get to that point, Judge Kayada, you're firmly within, I think, the classic antitrust claim, which only requires allegations of improper conduct that led to some wrongful acquisition of market power. If the Court has no further questions, I'll save the rest of my time for rebuttal. Thank you. Mr. Mizer, good morning. Good morning, Your Honor, and may it please the Court, Ben Mizer for Sanofi. Plaintiffs have talked a lot in their brief and again here this morning about plain text, but two things are abundantly clear. One is that the plain text of the Hatch-Waxman amendments actually required Sanofi to list the 864 patent because it is a drug product patent. And second, plaintiffs have ignored the administrative context and the statements by FDA and no fewer than five citizen petitions over the course of at least 15 years that have made clear that at worst the listing provision requirements and applicability here are unresolved by FDA. What's the penalty? Suppose you indisputably had a patent that claimed a drug. What's the downside? Is there any penalty on a manufacturer for deciding I'm not going to file this? I would say there are. I have a couple of thoughts on that, Your Honor. First of all, it is, as Mr. Wessler noted, a binary requirement. You either are required to list it or you're required not to list it. Let's assume you're required to and you don't. Correct. And if you do not list it, then you could subject yourself to another antitrust suit. We cited the example of the Mutual Pharmaceuticals case in our brief, and I think that's a good example of a case in which plaintiffs alleged that there was an antitrust violation for failing to list. And the reason for that is we agree with Mr. Wessler that there are benefits to patent holders for listing in the Orange Book. But what he omitted is that there are also benefits to follow-on manufacturers, like generic manufacturers, to Orange Book listings themselves. The whole point of the Hatch-Waxman amendments was to create a scheme that balanced both innovation and competition. And when a patent, like the 864 patent, is listed in the Orange Book, it puts follow-on competitors on notice of what patents they need to be on the lookout for as they are themselves trying to innovate, and it creates incentives for them to innovate. An additional incentive is that when the patent is listed in the Orange Book, if they then file a Paragraph 4 certification, which occurred with respect to Lilly in this particular case, then they are not risking troubled patent damages in any patent infringement litigation that may occur as a result of their submitting that Paragraph 4 certification. So the careful balance that Congress struck in enacting Hatch-Waxman was to create benefits for both the innovators and for the generic follow-ons. If that's correct, then it would still lead to the conclusion that if you unreasonably filed a patent for inclusion in the Orange Book, you could face antitrust liability. Your Honor, we do not contest that there could be antitrust liability for an Orange Book listing that had additional anti-competitive problems. For example, Walker Process Fraud, where the patent itself was obtained by fraud. Take this one, because I'm having great difficulty seeing how we have a patent that claims a drug here. Even if I follow the line of logic and the citation to the regs and the citation to the website and everything, and I actually get you home to a prefilled drug delivery system, that would at most be the pen. And as I read the ten claims in 864, forget about claiming a drug, it doesn't even seem to claim the pen. So even if you were correct that a prefilled drug delivery system, such as a prefilled injector pen, could be a drug, you don't have that here, unless I'm missing something. Respectfully, Your Honor, I disagree. I would start with the text of the statute itself, which says that a patent holder is required to list any patent which claims a drug. In this patent, we look at the ten claims for that. I don't even see an indirect reference to the drug. There's no reference to the drug at all. Respectfully, Your Honor, I disagree. What language are you calling this? Sure. The definition of drug is provided by the FDCA itself, and that is a quote. It's a very lengthy definition, and this is at 21 U.S.C. 321 G.1. And a drug is defined to include articles intended for use as a component of any article intended for use in the treatment of disease. That to me says it's a component of the drug. Correct. And the drug, the FDA has explained in the regulation, a drug includes a drug product or a drug patent. A drug product, FDA has further explained, is a drug delivery system, pre-filled drug delivery system. So the drug product here is not the drive mechanism that is expressly claimed in the 864 patent. The drug here is the drug product, which is the Lantus Solostar. I think the FDA has further explained that drug device combination products are complicated products, including in the King Pharmaceuticals letter that we cite in our brief and that is contained in the addendum to our brief. The FDA has explained that these kinds of products are complicated. Of course, more than one patent is going to claim the various components of a drug device combination product. The Lantus Solostar is a complicated patent. At Exhibit N, to plaintiff's complaint, they submitted the FDA approval package. That approval package makes abundantly clear that the FDA was very concerned about, of course, the safety and efficacy of the drug product, the Lantus Solostar. It wanted to ensure that Sanofi had done adequate testing to ensure that the drug product, the Lantus Solostar, was going to be safe and effective in administering insulin. But the drug product, again, they don't claim the Lantus Solostar in the patent. Your Honor, I would return to the language of the claim itself, which is contained in the appendix, which claims the drive mechanism for use in a drug delivery device comprising the dose dial sleeve and the other elements that are expressly claimed in the product. I think, in addition... That's like telling me the remote control for a TV set, I claim that as a patent. But I'm not claiming the TV set. I've got the drive mechanism to flip back from NFL to Red Sox, but I don't have a patent on the TV. Correct, Your Honor. But I think it's important to bear in mind that what Congress said was that, for purposes of Hatch-Waxman, a patent holder should list any patent claiming the drug for which the application was submitted. The application that was submitted here was for the Lantus Solostar. And the Lantus Solostar includes the drive mechanism that makes sure that the patient is receiving exactly the right amount of insulin. And so what Congress was concerned about was making sure that that product, the FDA-approved, all patents related to that drug product were listed in order to assist and enable competition. But even if I know... See, you keep slipping into that choice, you've done it now, is all products related to the drug product. I don't see that language in the regs or the statute. That's broader than saying a claim for the drug or the drug product. Correct, Your Honor. But the drug product here is the Lantus Solostar. The FDA would not have approved the Lantus Solostar without also approving the drug mechanism. But even if I am not persuading, Your Honor, on the textual interpretation of the statute, which it's worth noting does not contain the word active ingredient, even if I have not persuaded, Your Honor, of that textual reading, there is abundant evidence in the record created by plaintiffs by attaching it to their complaint that the FDA has confronted this question a number of times. At least five patent holders have said to the FDA, drug device combination products are complicated. They contain many different patents that claim various elements of drug device combination products. You have not clearly said that we are prohibited from listing those patents in the Orange Book. So we are going to continue to list those patents. FDA has repeatedly declined to say that that is an improper listing. Or that it's proper. We just have a we're too busy from the FDA. That is correct, Your Honor. And I'm having trouble seeing how I give any hour deference or even stigma deference to them saying we're too busy to answer a question. Well, in addition to those we're too busy responses, Your Honor, there is also the King Pharmaceutical Statement from the FDA, which is far more than a we're too busy form response, which explains the drug device combination products are complicated. And what I would say, the court heard a lot in the first argument this morning about the sentencing guidelines and Kaiser v. Wilkie from the Supreme Court just this past June. And what the court explained, as you know, in Kaiser is that where there is a regulatory ambiguity, the court has instructed that other courts are to follow Congress' instruction, which is to defer to the expert agency. What we know in addition to the citizen petitions and the nonresponse from the FDA is that they have repeatedly said that drug products are defined to include the dosage form. The dosage form, an example of a dosage form is a pre-filled drug delivery system and insulin injector pens are an exemplar of pre-filled drug delivery systems. That's claimed here, though. It doesn't claim the pre-filled form. In fact, it claims the pen for use with lots of different types of drugs. Your Honor, just because the drug product here, the Lantosolastar, might be used to deliver other drugs does not mean that it was not listable because, again, the point of the listing provision. So if I had a patent that had facilitated a certain mechanism for the vacuum on a syringe but doesn't claim the syringe, doesn't refer to anything being in it, your argument would be that that would get filed in connection with whatever drug the company had to make that could be used with that syringe. Well, what Congress said was that the patent needs to be listed if it claims the drug product for which the application was submitted. And how about, so someone makes something that they have a drug that does use syringes for administration. They then file a patent which is for a component on a syringe. I think your argument is that would be a proper filing. I'm not sure at all that that would be the answer. How is that different from what we have here? The critical inquiry here... Well, if the patent is like the syringe and the drive mechanism is like the component of the syringe. But again, your Honor, the critical inquiry here is the application for which approval of the drug product was submitted. And that application here, again, is at Exhibit N in the attachments to plaintiff's complaint. And it is abundantly clear in that approval package that the FDA was very concerned about the safety of the drive mechanism in the Lantus Solostar. In addition, your Honor, to return to the... You've lost me there because presumably the FDA would be very concerned about the vacuum on the syringe. I don't know, your Honor. But, your Honor, in your hypothetical, I don't know what the application for the FDA approval of that product might affect. The new flu virus that they've invented. And they've had a patent in it for 15 years for this flu virus. And then they file a patent for the vacuum component on a syringe and not claim the syringe, not even mention the flu virus, but file it. Your Honor, based on your description of what the FDA's approval might have been, that does not, to me, sound like a listable product. But they're a listable patent. How is that different? It's different, your Honor, because we know that the FDA asked Sanofi to do particular testing with respect to the drive mechanism claimed here. But I would also note, as we mentioned earlier in the argument, there could be antitrust consequences regardless of whether the patent holder lists or doesn't list. And there is only a binary option available to the patent holder. For it to be subject to antitrust trouble damages, simply for deciding to list in the teeth of ambiguous FDA guidance, would go beyond what this Court has said about antitrust liability. In the Town of Concord case, the Barry Wright case, and the Data General case, this Court has repeatedly said that antitrust analysis should be sensitive to the regulatory context and that patents are a lawful form of monopoly and that antitrust liability would reside against a patent holder only in instances where the patent monopoly was improperly leveraged. I think it cannot be said that a patent is improperly leveraged. When a patent holder, in the face of FDA ambiguity at worst, decides to list a patent, knowing that if it doesn't list the patent, it could face an antitrust suit. And now you're starting to back into MCI versus AT&T and the like, where you actually have a regulatory difficult choice like that, like you could be penalized. And so Seventh Circuit and at least one other circuit have said, in that situation, we're going to cut you some slack. If it's both reasonable and in good faith, then you can't face antitrust liability. I can't imagine we would have a stronger protection here, where what you're fearing is not government action, but another antitrust suit of a different type making the choice that way. That would seem to mean that your client's good faith is an element of the case. How do we decide that at a 12B6 stage? I think, Your Honor, it can be resolved exactly the way the district court resolved it or the way that the court in Organon resolved it, which is to say, if I may complete the answer to the question, which is to say simply that at worst is ambiguity from the regulating agency. We know from the Supreme Court in Kaiser that in the face of regulatory ambiguity, we leave it to the expert agency to resolve that ambiguity. And I think that there are other mechanisms for improper Orange Book listings to be corrected. Those include, among other things, a counterclaim if there is a patent infringement action following a paragraph 4 certification. The more efficient enforcer of an improper Orange Book listing, if one occurs, is the generic or follow-on competitor who can claim then in the follow-on litigation that the Orange Book listing was improper and should be delisted. Because of that mechanism, there is a need for additional antitrust liability to attach in the face of regulatory ambiguity. But under that mechanism, there would be no recovery for the period of time that passed between the listing in which while the FDA is not processing the application. You'd be off scot-free. Well, the first and most important thing to say is that the follow-on competitor would then itself obtain a period of exclusivity for the follow-on or generic product, which is exactly the incentive that Congress intended to create by erecting the Orange Book listing process through the Hatch-Waxman amendments was to create a period of exclusivity that incentivizes the creation of generic and follow-on products. If there are no further questions, we would respectfully submit that the Court should affirm the district court's denial of all plaintiffs' claims. Thank you. Thank you. Thank you. Yes. Thank you, Your Honor. Just a few brief points in rebuttal. I think we need to be really clear about exactly where in the FDA regulations the definition of drug product is. You heard my colleague reference part of the Code of Federal Regulations that has nothing to do with the Orange Book. The actual definition that governs what you can list and defines what it means for a patent to claim the drug is found in 21 CFR section 314.53. In that section, the FDA says, For patents that claim a drug product, the applicant must submit information only on those patents that claim the drug product as is defined in section 314.3. So it cross-references 314.3. If you go to 314.3, the FDA has specifically defined drug product, and this is what it says. Drug product is a finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally but not necessarily in association with one or more other ingredients. And if you go and look at what drug substance is defined as, drug substance is the active ingredient that is intended to furnish pharmacological activity. There is no way to read that definition, which is the only definition that applies when a manufacturer has to decide which patents to list in the Orange Book that covers the 864 patent or any of the Penn patents. For the very reason, as Judge Kayano, you pointed out, those patents have nothing to do with the active ingredient of the Lantus product, the insulin glycine. And it's that reason why there is no ambiguity in the regulations that define what patents can be listed. What Sanofi asks you to do is adopt, essentially, a product-based understanding of what it means to list in the patent book. Oh, Lantus Solustone was approved by the FDA, so we get to list every patent that's connected with Lantus Solustone. That is not what the definitions say. The definitions are patent-focused. If your patent claims Lantus Solustone, the finished dosage form that includes the drug, yes, you can list it. But if it does not, then you cannot list it. And if you do list it and, as a result, obtain improper market power, well, you have opened yourself up to antitrust liability. And the district court here misunderstood that basic framework and dismissed the claims prematurely in this case. We would ask this court to reverse. Thank you. Thank you. All rise.